*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0054P (6th Cir.)
File Name: 03a0054p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

　　　*v.*

CARLTON VICTOR SMITH
(01-5466); THOMAS ALBERT
NICHOLS (01-5468); JOHN
HERBERT CRISP (01-5469),
　　　　　*Defendants-Appellants.*

Nos. 01-5466/
5468/5469

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 00-00038—Curtis L. Collier, District Judge.

Argued and Submitted: September 19, 2002

Decided and Filed: February 18, 2003

Before: GUY, SILER, and BATCHELDER, Circuit
Judges.

———————————

## COUNSEL

**ARGUED:** John E. Eberly, EBERLY LAW FIRM,
Chattanooga, Tennessee, Rita C. LaLumia, FEDERAL
DEFENDER SERVICES OF EASTERN TENNESSEE,

1

INC., Chattanoga, Tennessee, for Appellants.  David C.
Jennings, ASSISTANT UNITED STATES ATTORNEY,
Knoxville, Tennessee, for Appellee.  **ON BRIEF:** John E.
Eberly, EBERLY LAW FIRM, Chattanooga, Tennessee, Rita
C. LaLumia, FEDERAL DEFENDER SERVICES OF
EASTERN TENNESSEE, INC., Chattanoga, Tennessee,
Willliam  H.  Ortwein,  ORTWEIN  &  ORTWEIN,
Chattanooga, Tennessee, for Appellants.  David C. Jennings,
Jeffrey E. Theodore, ASSISTANT UNITED STATES
ATTORNEYS, Knoxville, Tennessee, for Appellee.

---

## OPINION

---

SILER, Circuit Judge.  Defendants Carlton Victor Smith,
John Herbert Crisp, and Thomas Albert Nichols challenge, on
several  grounds,  their  convictions  and  sentences  for
conspiracy to commit bank robbery, in violation of 18 U.S.C.
§§ 371 and 2113, following bank extortions that occurred in
Knoxville, Chattanooga, and Clarksville, Tennessee.  Smith
also challenges his money laundering conviction in violation
of 18 U.S.C. § 1957.  Additionally, Nichols challenges the
sufficiency  of  the  evidence  in  support  of  his  firearm
convictions under 18 U.S.C. §§ 922(g)(1) and 924(c)(1).  For
the  reasons  that  follow,  we  affirm  the  convictions  and
sentences of all three defendants.

## BACKGROUND

In 1995, Douglas Daigle ("Daigle"), an unindicted co-
conspirator,  began  planning  the  first  of  several  bank
extortions that took place over the course of sixteen months
in Knoxville, Chattanooga, and Clarksville, Tennessee. Soon
thereafter, Daigle asked his wife, Capri Daigle ("Capri"), to
assist  him  with  the  bank  extortion.   Using  information
contained in a city directory and aerial maps of Knoxville,
Daigle learned the locations of various banks and homes of
bank managers.  Daigle planned to target the homes of female

branch managers for a home invasion. Once inside the branch manager's home, Daigle would abduct the branch manager's family and hold them hostage in order to force the manager to take a large sum of cash from the bank's vault and deliver it to a specified location to save her family from being killed. In the course of planning the Knoxville extortion, Daigle recruited several additional individuals including his wife's mother, Dena Farmer; her mother's live-in boyfriend, Ted Roberts; and Crisp.

In preparation for the Knoxville extortion, the five co-conspirators purchased communications equipment and obtained three firearms. Daigle selected the First American Bank as the target, and, along with Roberts and Crisp, conducted surveillance from behind the branch manager's house. Capri played the role of the branch manager as she and Daigle drove the routes involved to test the radio equipment.

On September 5, 1995, around 9:30 p.m., Daigle and Crisp forcibly invaded the home of Patricia Farry, branch manager of First American Bank. Once inside, they chained Mr. and Mrs. Farry's ankles, placed pillowcases over their heads, and explained that their purpose was to rob the bank. The Farrys' daughter remained asleep in her bedroom. Daigle questioned Mrs. Farry about the bank's security systems and how much money the vault contained. He told Mrs. Farry that she was to go to the bank as usual the next morning, remove the money, and deliver it to a specified location. If she failed to do so by 9:00 a.m., her husband would be killed with a bomb that would be strapped to him inside a van. Throughout the night, Daigle continued to go over the plan with Mrs. Farry and explained to her how to use the radio equipment and how to disarm the bomb.

Early the next morning, Mr. Farry was removed from the home. Mrs. Farry was told that her husband was taken to another location, which would be disclosed to her once she delivered the money. In actuality, Mr. Farry was taken

outside into the yard where he was held at gunpoint by Crisp until Mrs. Farry left for the bank.

When Mrs. Farry arrived at the bank, she explained the situation to her employees and asked for their cooperation. The vault was emptied and Mrs. Farry returned to the vehicle with bags of money and waited for Daigle to radio her the drop-off location. After Mrs. Farry made the drop as directed, she was told to walk to a specified phone booth at a nearby Waffle House restaurant to await further directions regarding the location of her husband. The phone call never came. After Mrs. Farry left for the bank, Daigle and Crisp had moved Mr. Farry back to the master bedroom where they wrapped him in duct tape and chained him to the bed. The bomb was a fake.

Roberts retrieved the money from the drop-off location and met Daigle to divide the proceeds. Next, Farmer and Roberts delivered Crisp's share to his residence in Greenback, Tennessee. Daigle and his wife fled Knoxville and went to the Pigeon Forge-Gatlinburg area. A few days later, Daigle told Capri that he had thrown the gun he used into an overgrown area near Interstate 40. When Capri began cooperating with the FBI, she disclosed this location and the gun was found in March 2000. Although Farmer, who also cooperated with the FBI, testified that Crisp told her that he had buried his gun, no other weapons used in the Knoxville extortion were discovered.

By the winter of 1996, Daigle was running out of money and decided to target another bank. Farmer loaned Daigle $5,000 of Roberts's share of the proceeds from the Knoxville extortion to finance the second extortion in Chattanooga. The same plan was to be implemented, only this time defendant Nichols was to join Daigle as an "inside man."

On March 14, 1996, Daigle and Capri, along with Roberts and Farmer, met Nichols and Crisp at a Cracker Barrel restaurant in Chattanooga to prepare for the extortion. Daigle

We have previously held that "impermissible 'double counting' occurs when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways." *United States v. Farrow*, 198 F.3d 179, 193 (6th Cir. 1999) (citing *United States v. Perkins*, 89 F.3d 303, 310 (6th Cir. 1996)). Given the unique circumstances of this case, however, we are not convinced that applying both enhancements results in impermissible double-counting. Nor do we believe that the limiting provision of § 3A1.2 contemplates a situation where different victims are both restrained and abducted. Crisp effectively abducted the bank manager when he forced her to drive to the bank with radios and communications attached to her car and Daigle following behind. The other members of the bank manager's family were restrained at a different location. Thus, in applying both enhancements, the district court penalized separate acts of violence directed toward different individuals rather than the same aspect of Crisp's conduct. Because one of the underlying philosophies embodied in the guidelines is to consider all harms caused by the defendant's conduct, the district court did not err in applying both enhancements.

**AFFIRMED.**

forced accompaniment under §§ 2113 (a) and (e). Section 2B3.1(b)(1) of the "Robbery" guideline provides for a specific offense characteristic concerned with the type of institution robbed. In contrast, no offense characteristic under the "Extortion by Force or Threat of Injury or Serious Damage" guideline contemplates the harm to a financial institution. The district court's decision to sentence Crisp under the robbery guideline more fully takes into account the harm to the victims as well as the financial institution. Therefore, the district court did not err in sentencing him under § 2B3.1.

### F.   Offense Level Increases

Crisp claims that the district court violated his due process rights when it applied a four-level increase to his base sentence pursuant to § 2B3.1(b)(4)(A) for abduction of the bank managers and a two-level increase under § 3A1.2 for physical restraint of a victim. Specifically, Crisp argues that the district court engaged in impermissible "double counting" by penalizing him twice for restraining the bank managers and their families. Legal conclusions regarding the guidelines are reviewed *de novo*; however, this circuit gives due deference to the district court's application of the guidelines to the facts pursuant to 18 U.S.C. § 3742(a). *Buford v. United States*, 121 S. Ct. 1276, 1281 (2001).

Section 2B3.1(b)(4)(A) provides for a four-level increase to a base sentence "[i]f any person was abducted to facilitate commission of the offense or to facilitate escape." Section 3A1.2 similarly adjusts the base sentence upward by two levels where "the victim was physically restrained in the course of the offense," but also directs the court "not [to] apply this adjustment where the offense guideline specifically incorporates this factor, or where the unlawful restraint of a victim is an element of the offense itself." Thus, in most circumstances where the victim is abducted, the limiting provision of § 3A1.2 prevents the sentencing court from applying enhancements under both § 2B3.1(b)(4)(A) and § 3A1.2 since restraint often occurs as part of an abduction.

had selected a SunTrust Bank in Chattanooga as their target. The branch manager, Teresa Bailey, lived just across the state line in Rossville, Georgia.

At about 8:00 p.m., Daigle arrived at the Bailey home under the pretense of purchasing a puppy that the Baileys had advertised. Once inside, Daigle pulled a gun and explained his plan to extort money from Mrs. Bailey's bank. Nichols, also armed, entered and they held Mrs. Bailey hostage at gunpoint until her husband and son arrived home for the evening. The entire family was bound. Mrs. Bailey's son was tied to his bed and Mr. Bailey was taken to the garage where he was held face down on the floor at gunpoint all night. Mrs. Bailey was told that her husband had been taken away in a van with a bomb strapped to him.

The next morning, Mrs. Bailey and her son went to the bank, gathered the money, and delivered it to the drop-off site as instructed over the radio by Daigle. Mrs. Bailey was told that her husband was at home with the bomb. Like the previous occasion, the bomb was a fake. Upon arriving home, Mrs. Bailey learned that her husband had freed himself after Daigle and Nichols had left him.

Nichols retrieved the money from the drop-off site and met Capri at the same Cracker Barrel restaurant to load the money into her car. After dividing the money, the conspirators returned to Knoxville and the money was divided between Nichols, Daigle, and Roberts. Daigle instructed Nichols to get rid of the weapons used in the extortion. Once again, Daigle and Capri fled to the Gatlinburg area.

Several months later, in the summer of 1996, Daigle began to plan what would be the third and final extortion. He selected the First American Bank located in Clarksville. Smith, who was introduced to Daigle by Crisp, joined the plan and was to accompany Daigle into the victim's home. Nichols would conduct surveillance as the "outside man." The

*modus operandi* was the same as the Knoxville and Chattanooga extortions.

On December 12, 1996, while branch manager Carolyn Pierce was still at work, Daigle entered her home under the guise of a real estate agent. Mrs. Pierce's father, Leonard Beaudoin, and his wife, who were babysitting the Pierces' son, unsuspectingly allowed Daigle into the home. Once inside, Daigle held the Beaudoins and their grandson hostage at gunpoint. According to Mr. Beaudoin's testimony, an armed man wearing a ski mask and gloves, later identified as Smith, joined Daigle. Shortly thereafter, Mr. Pierce arrived home from work and was immediately bound and blindfolded. When Mrs. Pierce arrived home, Daigle explained his demands and told her that her husband would be killed by a bomb if she did not comply. At one point during the night, Daigle forced Carolyn Pierce to disrobe from the waist down and threatened to rape her while her family watched. Daigle also threatened that he would force her husband to perform oral sex on Smith.

During the night, Mr. Beaudoin managed to hide some of Smith's cigarette butts in a waste basket. The butts were later determined to contain the DNA of Smith.

On the way to the bank the following morning, Mrs. Pierce dropped Daigle off near a McDonald's restaurant, where he and Capri instructed Mrs. Pierce via radio. She proceeded to the bank, withdrew the money, and left it in her pickup truck at the location specified by Daigle. Smith and Nichols placed Mr. Pierce, who was still bound and blindfolded, into his vehicle and drove him to the parking lot of a Waffle House restaurant where he was later found.

Smith, Crisp, and Nichols were indicted and tried in the Eastern District of Tennessee at Chattanooga. Daigle was arrested but committed suicide before trial. Evidence at trial included the testimony of co-conspirators, Capri and Farmer, who cooperated with the FBI. All three defendants were

### E.   Sentencing Guideline

Crisp contends that the district court erred when it sentenced him under the USSG § 2B3.1, entitled "Robbery," rather than § 2B3.2, entitled "Extortion by Force or Threat of Injury or Serious Damage." The base offense level under § 2B3.1 is 20, whereas the base offense level under § 2B3.2 is 18. A district court's interpretation of the United States Sentencing Guidelines is reviewed *de novo*. *United States v. Moore*, 255 F.3d 637, 641 (6th Cir. 2000).

In selecting the applicable guideline, § 1B1.2(a) directs the court to use the guideline referenced in the Statutory Index (Appendix A) for the offense of conviction. "In the case of a particular statute that proscribes a variety of conduct that might constitute the subject of different offense guidelines, the Statutory Index may specify more than one offense guideline for that particular statute, and the court will determine which of the referenced guideline sections is most appropriate for the offense conduct charged in the count of which the defendant was convicted." USSG § 1B1.2 (comment.) n.1. Thus, as Crisp correctly asserts, the guidelines provide that a conviction of 18 U.S.C. § 2113 (a) may be sentenced under § 2B3.1 or § 2B3.2.

Our review of this case, however, leads us to conclude that sentencing under the robbery guideline is most appropriate. Crisp's conduct was not limited to threats of future violence typical of most extortions where the victims themselves are forced to "pay up." From the outset, the conspiracy was directed at accomplishing one overarching objective--a bank robbery. The events that Crisp characterizes as indicative of extortion--invading branch managers' homes, threatening their family members, and promising the release of their husbands in return for money--were merely intermediate steps toward completing the ultimate goal of robbing a bank.

Crisp was convicted of armed bank extortion in violation of 18 U.S.C. §§ 2113 (a) and (d) as well as bank robbery with

Although Smith concedes that the jury instructions were an accurate reflection of the law,[2] he nevertheless contends that the instructions should have required the jury to find that he knew the property was derived from the bank robbery by extortion (rather than an unspecified crime) as per the indictment. This court reviews *de novo* the determination as to whether there has been an amendment to, or variance from, an indictment. *See United States v. Manning*, 142 F.3d 336, 339 (6th Cir. 1998).

A constructive amendment results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment. *See United States v. Stirone*, 361 U.S. 212 (1960); *United States v. Cusmano*, 659 F.2d 714 (6th Cir. 1981). In the instant case, we find no variance or amendment to the indictment. Neither the indictment nor the instructions required the government to prove that the defendant knew the money was derived from bank robbery by extortion; the language of the jury instructions mirrors the terms of the indictment. Thus, the jury instructions did not broaden the indictment beyond the charges contemplated by the grand jury.

---

$19,509, such funds having been derived from specified unlawful activity, that is, a bank extortion in violation of 18 U.S.C. § 2113.

[2]Section 1951(a) provides, in relevant part "that it is unlawful to knowingly [engage or attempt] to engage in a monetary transaction in a criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." Section 1951(c) further indicates that the defendant's knowledge that the property is from a specified unlawful activity is not an element of the offense.

convicted on multiple counts. Smith, Crisp, and Nichols were each ordered to pay restitution and sentenced to 180, 627, and 295 months of imprisonment, respectively.

### DISCUSSION

#### A. Single versus Multiple Conspiracy

Smith and Crisp both argue that no reasonable juror could have found the existence of a single conspiracy to extort banks based on the evidence presented at trial. They maintain that the evidence proves three separate conspiracies that ended with the disbursement of the monies extorted. Furthermore, Smith and Crisp contend that they were prejudiced by testimony detailing the criminal acts of members involved in the conspiracies in which they did not participate.

The United States Supreme Court has held that "if an indictment alleges one conspiracy, but the evidence can reasonably be construed only as supporting a finding of multiple conspiracies, the resulting variance between the indictment and the proof is reversible error if the appellant can show that he was prejudiced thereby." *United States v. Warner*, 690 F.2d 545, 548 (6th Cir. 1982) (citing *Kotteakos v. United States*, 328 U.S. 750 (1946)). The principal considerations in determining the number of conspiracies are the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings. "Whether single or multiple conspiracies have been shown is usually a question of fact to be resolved by the jury. . .and [is] to be considered on appeal in the light most favorable to the government." *United States v. Schultz*, 855 F.2d 1217, 1222 (6th Cir. 1988) (internal quotations omitted).

Viewed in the light most favorable to the government, a rational trier of fact could have found that Smith and Crisp had knowledge of and agreed to participate in a single, overarching conspiracy. The goal of all three extortions was to steal large amounts of bank money through a common plan

to invade the homes of bank managers, hold their families hostage, and threaten the lives of the husbands. Each extortion followed an identical *modus operandi* and was led by Daigle who "picked the targets" and "drew up the plans." Capri and Farmer both testified that in the months between the robberies Daigle would initially wait until "things died down, cooled off" but would then begin scouting out other possible targets, sometimes abandoning his initial choice for a better locale. The overlapping participants--Daigle, Capri, Farmer, and Roberts--in each extortion were friends and family who regularly associated with one another. Farmer also loaned Daigle $5,000 from Roberts's share of the money from the Knoxville extortion to purchase communications equipment and an old car to use in the Chattanooga extortion.

The fact that Smith and Crisp did not participate in every bank extortion does not transform the scheme from a single conspiracy into multiple conspiracies. *See Warner*, 690 F.2d at 549 ("[A] single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy."). To prove a single conspiracy, the government need only show that each alleged conspirator had knowledge of and agreed to participate in what he knew to be a collective venture directed toward a common goal. *Id.* Knowledge of a single conspiracy may be proved by circumstantial evidence such as inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme. *United States v. Lee*, 991 F.2d 343, 348 (6th Cir. 1993) (citing *United States v. Poulos*, 895 F.2d 1113, 1117 (6th Cir. 1981)).

In the instant case, Capri testified that Crisp became involved in the planning phase of the first extortion and remained in contact with the group throughout the completion of the second. Smith, who participated in the third extortion only, was introduced to Daigle by Crisp. Prior to the Clarksville extortion, Smith spent a great deal of time with

prove only a minimal nexus between the firearm and interstate commerce. *Id.* at 1211.

When viewed in the light most favorable to the government, the evidence is sufficient for a reasonable juror to infer that Nichols possessed the gun in Tennessee and carried it across the state line into Georgia where he used it to hold the Bailey family hostage. Capri testified the conspirators prepared and armed themselves for their invasion of the Bailey home at a Cracker Barrel restaurant parking lot near the Hamilton Mall in Tennessee. From there, she indicated that the defendants drove to the Bailey home in Georgia. Teresa Bailey testified that Daigle and Nichols each possessed guns and held her family hostage at gunpoint throughout the night. Her husband, William Bailey, testified that Nichols took him into the garage and guarded him at gunpoint all night. Capri further testified that she saw Nichols loading bags into her mother's white Honda in the same Tennessee Cracker Barrel parking lot immediately after the extortion had been completed. Although circumstantial, this evidence is sufficient for a juror to reasonably infer that sometime between the invasion of the Bailey's home and the conclusion of the bank robbery, Nichols crossed the state line with a firearm. As such, the interstate nexus element of 18 U.S.C. § 922(g)(1) and the jurisdictional element of 18 U.S.C. § 924(c)(1) are satisfied.

### D.   *Constructive Amendment of the Indictment*

Smith argues that the jury instructions resulted in a constructive amendment to the indictment, which charged one count of money laundering under 18 U.S.C. § 1957.[1]

---

[1] Count Fourteen of the indictment charged the following: [O]n or about January 22, 1997, in the Eastern District of Tennessee, defendant, CARLTON VICTOR SMITH. . .knowingly used criminally derived property of a value greater than $10,000 to engage in a monetary transaction by, through, and to a financial institution affecting interstate commerce, that is, the purchase of a Harley-Davidson motorcycle. . .with

made in furtherance of the conspiracy under Rule 801(d)(2)(E). *See Clark*, 18 F.3d at 1342 (holding that statements identifying participants and their respective roles in the conspiracy are made in furtherance of a conspiracy). Therefore, the district court did not abuse its discretion in ruling that the out-of-court statements were admissible.

## C. Sufficiency of the Evidence Supporting the Firearm Convictions

Nichols challenges the sufficiency of the evidence in support of his convictions for being a felon in possession of a firearm in violation 18 U.S.C. § 922(g)(1) and use of a firearm in a crime of violence in violation of 18 U.S.C. § 924(c)(1). He argues that the government failed to establish that he possessed the firearm in Tennessee and that the firearm traveled in or affected interstate commerce. In reviewing a challenge to the sufficiency of the evidence presented to establish the defendant's guilt, this court views all evidence in the light most favorable to the government and determines whether there is any evidence from which a reasonable jury could find guilt beyond a reasonable doubt. *See United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999).

"In order to convict under 18 U.S.C. § 922(g)(1), the Government must prove the following three elements: (1) that the defendant had a previous felony conviction, (2) that the defendant possessed a firearm, (3) that the firearm had traveled in or affected interstate commerce." *United States v. Walker*, 160 F.3d 1078, 1087 (6th Cir. 1998) (citation and quotations omitted). Unlike Section 922(g)(1), however, a conviction under 18 U.S.C. § 924(c)(1) does not require proof of an interstate nexus element. *See United States v. Gibbs*, 182 F.3d 408, 425-26 (6th Cir. 1999). Possession can be either actual or constructive and may be proved by direct or circumstantial evidence. *United States v. Murphy*, 107 F.3d 1199, 1207 (6th Cir. 1997). The government is required to

Daigle and accompanied him to Goodlettsville where Daigle and Nichols were preparing for the final extortion. A reasonable juror could infer from those associations that Daigle had disclosed the prior robberies and the continuing nature of the scheme to both Crisp and Smith.

Despite this evidence, the defendants urge us to find three separate conspiracies, arguing that it is an accepted principal of conspiracy law that "once the proceeds of the conspiracy are divided the conspiracy has ended." The cases upon which the defendants rely, however, do not hold that conspiracies automatically terminate at each payout. Instead, these cases merely illustrate the fact that, as with all types of conspiracies, a conspiracy continues until the objective for which it is formed is attained. *See McDonald v. United States*, 89 F.2d 128, 132-34 (8th Cir. 1937) (holding that the conspiracy included the exchange of the marked ransom money for unmarked bills seven months after the kidnaping took place since this act was clearly contemplated by the conspirators); *see also Krulewitch v. United States*, 336 U.S. 440, 441-44 (1949); *Koury v. United States*, 217 F.2d 387, 388 (6th Cir.1954).

A defendant may be convicted for a single conspiracy if the evidence supports a finding that he had knowledge or foresight of the conspiracy's multiplicity of objectives even where the "conspiracy is open-ended (e.g., a conspiracy to rob banks) and the specifics of the future crimes (e.g., which banks) is undetermined or at least unknown to the defendant." *United States v. Morrow*, 39 F.3d 1228, 1234 (1st Cir. 1994); *see also United States v. LiCausi*, 167 F.3d 36, 45 (1st Cir. 1999); *United States v. James*, 432 F.2d 303, 305-06 (5th Cir. 1971) (rejecting the defendant's claim that the evidence failed to link him to the larger, single conspiracy where the defendant participated in only a single robbery, noting that it was permissible for the jury to infer that the defendant likely learned of previous robberies during his continued association with several co-conspirators during the planning phase of his robbery). Based on the evidence presented at trial, a

reasonable juror could have found that Smith and Crisp participated in a single conspiracy to extort banks, and, therefore, were not prejudiced by the admission of testimony regarding criminal acts of the other co-conspirators. Accordingly, the defendants' claim must fail.

*B.  Admission of Co-conspirator Statements*

Smith, Crisp, and Nichols contend that the trial court improperly admitted the testimony of two co-conspirators, Daigle and Farmer. In order to properly admit co-conspirator statements as non-hearsay, the government must show by a preponderance of the evidence that (1) the conspiracy existed, (2) the defendant against whom the hearsay is offered was a member of the conspiracy, and (3) the hearsay statement was made in the course of and in furtherance of the conspiracy. *United States v. Enright*, 579 F.2d 980, 986-87 (6th Cir. 1978). This preliminary finding is the sole province of the judge who may, as was done here, admit the hearsay statements subject to a later ruling that the government has met its burden. *United States v. Vinson*, 606 F.2d 149, 153 (6th Cir. 1979). This court reviews the district court's conclusions with respect to whether co-conspirator statements may be properly admitted under Fed. R. Evid. 801(d)(2)(E) for abuse of discretion. *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716 (6th Cir. 1999).

A district court may rely on a co-conspirator's hearsay statement to determine whether a conspiracy has been established; however, there must also be some independent corroborating evidence of the defendant's knowledge of and participation in the conspiracy to sufficiently rebut the "presumed unreliability of out-of-court statements." *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994). The defendants claim that the trial court erred by failing to indicate on the record that it relied on independent evidence supporting the admissibility of the co-conspirator statements and, as a result, the jury was allowed to convict solely on the

basis of the co-conspirator testimony. This contention is without merit.

At the close of the government's case-in-chief, the court determined, by a preponderance of the evidence, that "the government has put in sufficient facts from which a reasonable juror could determine that the alleged [single] conspiracy did in fact exist." *Cf. United States v. Moss*, 9 F.3d 543, 549 (6th Cir. 1993) (cautioning that more specific *Enright* findings are preferred but finding no reversible error where the district court made a conclusory statement that it "didn't make that determination on the record but clearly there is no problem" in response to the government's prompting). In addition to the direct observations of Capri and Farmer, the district court relied upon independent corroborating evidence including Crisp's admission to an FBI agent that he had prevented a rape during the Knoxville extortion, which implicitly places him at the scene and presupposes that he was a member of the conspiracy. As for Smith, the court relied on the testimony of Smith's cousin, Gerald Ricketts. Ricketts testified that Smith made several statements that would indicate he was a member of the conspiracy, namely that he "did a bank job" near Nashville where they got $861,000 and that he had buried some of the money. Ricketts also testified that, around Christmas 1997, he overheard Smith and Nichols laughing about how they needed to dig up more money to purchase gifts.

Additionally, the trial court properly determined that the testimony given by Capri and Farmer included statements made in furtherance of the alleged conspiracy. *United States v. Hamilton*, 689 F.2d 1262, 1270 (6th Cir. 1982) (holding that a statement is in furtherance of a conspiracy if it is intended to promote the objectives of the conspiracy). Although the defendants do not set forth the specific statements to which they object, the record is replete with testimony discussing Daigle's statements which identify the defendants' respective roles and direct their participation during the planning phase. These statements were clearly