NOT-RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0356n.06

Nos. 13-5270/ 5271

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
May 05, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| Plaintiff-Appellee, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| v. | ) | |
| | ) | |
| STEVEN WASHINGTON and FREDDIE | ) | |
| CAMPBELL, JR., | ) | |
| | ) | |
| Defendants-Appellants. | | |

BEFORE: KEITH, COOK, and KETHLEDGE, Circuit Judges

**DAMON J. KEITH, Circuit Judge.** A grand jury in the Eastern District of Kentucky indicted Defendants Steven Boyd Washington and Freddie Campbell, Jr., ("Campbell") as well as six other individuals for conspiracy to distribute oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Campbell was also indicted for attempting to possess oxycodone with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

While the other co-defendants pleaded guilty, Washington and Campbell proceeded to trial. Both defendants made numerous motions to sever their trials; each motion was denied. The jury convicted both Washington and Campbell on Count One (conspiracy to distribute oxycodone) and additionally convicted Campbell on Count Eleven (attempted possession). The district court sentenced Washington to 80 months of imprisonment and Campbell to concurrent terms of 120 months of imprisonment on Count One and Eleven.

1

Case Nos. 13-5270/ 5271
*USA vs. Steven Washington and Freddie Campbell, Jr.*

Both defendants raise a number of challenges to their convictions and sentences in this consolidated appeal. For the reasons that follow, we AFFIRM both convictions and REMAND to the district court for a hearing as to whether Campbell's criminal history score was properly calculated.

**I.**

In early 2011, Kentucky police began noticing a large influx of oxycodone pills in Clark County, Kentucky and the surrounding area. Using undercover informants, detectives made a number of controlled purchases from Mr. James Martin, whom they identified as the source of the pills. During these transactions, Martin stated that he had obtained the pills from a Florida supplier named "Bear." Detectives then made a number of controlled purchases from individuals associated with Martin, many of whom had familial or personal relationships with one another.

In June 2011, an undercover officer contacted Martin and ordered 1,000 oxycodone pills for $23,000. Martin agreed, and traveled with his wife to Florida, where they received the pills from Bear. On their way back, they stopped in Richmond, Kentucky as planned to deliver 1,000 oxycodone tablets to the undercover agent. After Martin displayed the pills to the agent, police surrounded his car, arrested him and his wife, and seized the pills. Martin agreed to cooperate with the police, informed them of his recent trip to Florida, and disclosed his intent to deliver 400 pills to Defendant Campbell.[1] Martin was then instructed to make several recorded telephone calls to other co-defendants, including calls to "Bear," whom Martin and his wife would later identify in Court as Defendant Washington, and to Defendant Campbell. Detectives

---

[1] In a subsequent call, Martin agreed to reduce the delivery to 300 pills. (R. 616, PgID #3951, 3975-76).

later determined that Washington was Martin's Florida-based supplier, and Defendant Campbell was a mid-level distributer in the conspiracy.

Based upon the calls that were made, arrangements were made for the Martins to drop off 300 pills at a Best Western parking lot to Defendant Campbell. When Campbell arrived at the hotel to receive the pills, he was arrested.

A few weeks later, there was a second investigation by law enforcement which resulted in the bringing of the superseding indictments. A first Superseding Indictment consisting of fifteen counts was filed on September 01, 2011. (R. 37, Superseding Indictment, PgID# 94-99). A Second Superseding Indictment consisting of eighteen counts was subsequently filed on January 05, 2012. (R. 180: Superseding Indictment, PgID# 539-45.). The dates of the alleged conspiracy were from February 2011, continuing through August 2011. In addition to Campbell, and Washington, the other named co-conspirators in the indictment were Michael A. Marshall, Jr., James William Martin, Jr., Leslie Michelle Martin, Khevis Lee Campbell, Freddie L. Campbell, III, and Vonshell Lindsey.

Prior to trial, six of the eight defendants pleaded guilty; only Washington and Campbell proceeded to trial. Both defendants filed several motions to sever, all of which were denied. At trial, the government presented testimony from law enforcement, James and Michelle Martin, and several cooperating defendants describing the oxycodone supply chain and Washington and Campbell's participation in it. The Martins testified that Washington was the man they referred to as "Bear" and that he had supplied James Martin with the pills. Washington filed a motion for judgment of acquittal, arguing that the government failed to prove that he was "Bear."

Campbell, acting *pro se*, filed a similar motion, arguing that the government's evidence failed to establish his involvement in the conspiracy. The district court rejected both motions.

At the close of trial, both defendants renewed their motions. The district court again denied both motions and submitted the case to the jury, which convicted both defendants on the conspiracy charge and also convicted Campbell on one count of attempting to possess oxycodone with intent to distribute it. Defendants now appeal.

## II.

Defendants Washington and Campbell, either jointly or individually, argue that their convictions should be overturned because (1) the evidence was insufficient to prove Washington's involvement in the charged conspiracy; (2) there was a prejudicial variance between the indictment and evidence offered at trial, and that the district court erred when it refused to give a multiple conspiracy instruction; (3) the district improperly refused to sever Defendants' trial; (4) the district court made erroneous evidentiary rulings; (5) the district court improperly refused to grant Campbell's motion for a mistrial; and (6) the district court miscalculated Campbell's advisory Sentencing Guideline range. We AFFIRM the judgment of the district court but REMAND for resentencing of Defendant Campbell.

### 1. Sufficiency of the Evidence

This Court reviews *de novo* the sufficiency of the evidence to sustain a conviction. *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009). In order to convict a defendant for conspiracy to possess with intent to distribute narcotics under 21 U.S.C. §§ 841(a)(1) and 846, the jury must find the following beyond a reasonable doubt: (1) the existence of an agreement to

violate drug laws, (2) the defendants' knowledge and intent to join the conspiracy, and (3) the defendants' participation in the conspiracy. *See United States v. Robinson*, 547 F.3d 632, 641 (6th Cir. 2008).

A defendant bringing such a challenge bears a "very heavy burden." *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003). Evidence is sufficient to sustain a conviction if "after viewing the evidence in the light most favorable to the prosecution, and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony, any rational trier of fact could find the elements of the crime beyond a reasonable doubt." *Gunter*, 551 F.3d at 482. In examining claims of insufficient evidence, this Court does not "weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury." *Id*. Washington concedes that a narcotics distribution conspiracy operated among the Kentucky co-defendants, but challenges the sufficiency of evidence to establish that he was the individual referred to as "Bear," and that he knowingly and willfully joined the conspiracy alleged in the Second Superseding Indictment. Washington Br. at 22.

In support of his argument, Washington contends that the crux of the government's evidence, the testimony of co-defendants, James and Michelle Martin, was self-serving and suspect. Martin stated that he had face-to-face interactions with "Bear" on four occasions: in a motel, when Martin picked up pills from Campbell, (R. 616, PgID #3939-40, 4012); during a previous trip to Florida, (*id*., PgID #4019); at Martin's home in Kentucky, when Bear went there to deliver pills, (R. 617, PgID #4150); and on his last trip to Florida, (R. 616, PgID #3935). Twice, while on the witness stand, the government asked Martin to identify the individual whom

he knew as "Bear," at which point Martin pointed to Washington. (*id.*, PgID #3943); (R. 617, PgID #4127). For her part, Michelle Martin offered similar testimony in Court and also identified Washington as "Bear." (R. 617, PgID #4190).

Washington's assertion that the Martins' testimony was self-serving because it was offered in exchange for a reduced sentenced can be readily dismissed. The jury heard sufficient testimony from the Martins, from which it could reasonably conclude that Defendant Washington was, in fact, "Bear," and that he knowingly and intentionally joined a conspiracy to distribute oxycodone in Kentucky. That the Martins had a motive for their testimony does not necessarily render it incredible. Because the determination of what "weight [should] be given to [a witness's in-court] identification [i]s a jury question," *United States v. Hamilton*, 684 F.2d 380, 383 (6th Cir. 1992), this Court does not revisit the jury's credibility determinations.

Washington next argues that the Martins' testimony is not credible because "[i]t would be highly unusual for a Florida pill supplier to 'front' drugs and not be paid at the time the pills are transferred to the buyer." Washington Br. at 19. He continues on, without providing any empirical data or evidentiary support for his argument, that "[d]ue to the risks associated with drug dealing, pill suppliers in other states typically require payment at the time the pills change hands." *Id*. Given the total lack of data in support Washington's contention, a reasonable jury surely could have dismissed this claim.

Lastly, Washington objects to the fact that the government never obtained cell-phone records from the cell phone belonging to "Bear," which, if produced, could have further inculpated Washington in the conspiracy. The government responds that the cell phone records

had already been deleted by the provider by the time it began its investigation.[2] Although the government's explanation is not fully satisfying, given what is known regarding the widespread surveillance of cell phone data, it nevertheless has no impact on the question of whether the evidence the government did actually present was sufficient to establish a conviction. We hold that it was.

## 2. Variance

Ordinarily, we review *de novo* the question of whether a variance has occurred. *United States v. Caver,* 470 F.3d 220, 235 (6th Cir. 2006). However, when a defendant raises the variance issue for the first time on appeal, this Court reviews for plain error. *United States v. Adams*, 722 F.3d 788, 805 (6th Cir. 2013). Although Washington did not explicitly raise the variance issue at trial, he did request a jury instruction on multiple conspiracies, which was denied. (R. 618, PgID #4498, 4520). In *Adams*, this Court intimated that such a request may be sufficient to preserve a variance claim. 722 F.3d. at 805 n.9. Nevertheless, we need not decide which standard of review applies here because Washington's claim fails under either standard.

"A variance to the indictment occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Caver,* 470 F.3d at 235. In conspiracy cases, "a variance constitutes reversible error only if . . . the indictment alleged one conspiracy, but the evidence can reasonably be

---

[2] Defendant Washington was not named as a defendant in this case until the Second Superseding Indictment was filed on January 5, 2012, over six months after the arrests of James Martin and co-Defendant Campbell. Accordingly, the government contends that by the time it sought to produce the allegedly incriminating text messages, they had already been deleted by the provider.

construed only as supporting a finding of multiple conspiracies." *Id*. at 235-36 (quotation marks, alterations, and citation omitted). In conducting this inquiry, this Court views the evidence in a light most favorable to the government, *id*. at 236, and examine the presence of "a common goal, the nature of the scheme, and the overlapping of the participants in various dealings." *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003). We will reverse the defendant's conviction only if (1) a variance occurred, and (2) that variance affected his substantial rights. *See United States v. Swafford*, 512 F.3d 833, 841 (6th Cir. 2008).

### A) Existence of a Single Conspiracy

Defendant Campbell raises a similar, but distinct argument on appeal—that the district court erred when it failed to give a multiple conspiracy instruction. "[W]hen the evidence is such that the jury could within reason find more than one conspiracy, the trial court should give the jury a multiple conspiracy instruction." *United States v. Warner*, 690 F.2d 545, 551 (6th Cir. 1982). Such an instruction guards against "the transference of guilt," whereby the jury convicts the defendant "for a conspiracy for which he was not indicted." *Caver*, 470 F.3d at 246. A defendant is entitled to reversal of a conviction based on the district court's failure to give a requested jury instruction if "(1) the instructions are correct statements of the law; (2) the instructions are not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the defendant's theory of the case." *United States v. Newcomb*, 6 F.3d 1129, 1132 (6th Cir. 1993). Because Campbell preserved this issue, we review the district court's decision to deny the multiple conspiracy instruction for abuse of discretion. *See United States v. Kelsor*, 665 F.3d 684, 695 (6th Cir. 2011).

Both Defendants allege that the evidence at trial proved that there were actually multiple, distinct oxycodone distribution conspiracies, which varied from the indictment's allegation of one conspiracy. Washington argues that the evidence from the other conspiracies, of which Washington was allegedly not a part, spilled over onto Washington and prejudiced him at trial:

> Here, the trial evidence shows that the defendants (except Mr. Washington) were, at best, parts of at least two (and perhaps four) separate conspiracies, with several overlapping Kentucky participants, including a father, Co-Defendant Freddie L. Campbell, Jr. (who was the sole defendant to go to trial with Mr. Washington) and his sons, Co-Defendants Freddie L. Campbell, III and Khevis Lee Campbell (a Miami resident), who pleaded guilty prior to trial. Three Co-Defendants, Mike Marshall, Vonshell Lindsey and Freddy L. Campbell, III, lived together in a Winchester, Kentucky apartment. Because of these overlapping interrelationships among members of at least two different conspiracies, there was no real way that the jury could compartmentalize the evidence against Mr. Washington, who at best might have been in a drug conspiracy with Messrs. James W. Martin, Jr., Campbell, Jr., Michael L. Marshall, Jr. and Leslie Michelle Martin. Thus, the evidence against the other interrelated Co-Defendants named in the Indictment spilled over onto Mr. Washington, and prejudiced him in the eyes of the jury. What prejudiced Mr. Washington the most was that the sole defendant to go to trial with him, Campbell, Jr., was the father of two co-defendants, and they were overlapping members of separate conspiracies to which Mr. Washington could not have been a member.

Washington Br. at 24-25.

Alleging the same concerns, Campbell points out that the drug sales of Sheila McCarty as well as those involving Vonshell Lindsey, Freddie Campbell, III, and Khevis Campbell were separate conspiracies, of which he was not a part. However, a careful review of the record reasonably supports the jury's conclusion that all eight defendants engaged in one conspiracy. That they may not all have known each other is not dispositive as they all shared a common goal: the illicit distribution of oxycodone. *See Smith*, 320 F.3d at 652 (in evaluating whether there were multiple conspiracies, the Court examines the presence of "a common goal, the nature of

9

the scheme, and the overlapping of the participants in various dealings"). The various defendants interacted in a traditional distribution chain, funneling the pills from suppliers, to mid-level distributers, to local dealers. *See United States v. Maddox*, 944 F.2d 1223, 1232 (6th Cir. 1991) (internal quotation and citation omitted). ("[T]he unity essential to a conspiracy is derived from the assent of its members to contribute to a common enterprise . . . regardless of the locations at which the members operated.").

United States v. Caver, 470 F.3d 220 (6th Cir. 2006) is instructive. There, fifteen individuals were convicted of a conspiracy to possess crack cocaine with intent to distribute. *Id.* at 227. Defendants argued that there while the indictment alleged a single conspiracy, the evidence at trial demonstrated multiple conspiracies as certain defendants did not know each other, or, at best, interacted very infrequently. This Court rejected that claim, finding that where defendants are on the same "horizontal" level of distribution, they can be part of a single "chain" conspiracy. *Id.* at 236 ("Even if the direct contacts between [Defendants] were infrequent or nonexistent, a reasonable jury could find that all three defendants were part of a single "chain" conspiracy."). *See also United States v. Lee*, 991 F.2d 343 (6th Cir. 1993); *United States v. Kelley*, 849 F.2d 999, 1003 (6th Cir. 1988).

Likewise, in this case, the evidence revealed that multiple suppliers funneled oxycodone pills into a distribution channel operated by James Martin. That certain co-conspirators filled the void after Martin was arrested—whom Washington or Campbell may not have known—is not enough to remove them from the larger conspiracies. These defendants still had connections to Martin, they shared the same drug-distribution objective, and they operated in the same area. *See*

10

*United States v. Wilson*, 168 F.3d 916, 924 (6th Cir. 1999) ("The mere fact that a conspiracy can be subdivided . . . does not mean that multiple conspiracies existed."). When Washington and Campbell knowingly joined Martin's oxycodone distribution conspiracy, they also entered the larger conspiracy which included the other co-conspirators in this case.

### B) Prejudice

Assuming arguendo the existence of separate conspiracies not charged in the indictment, both Washington and Campbell are unable to establish how the alleged variance or denial of a multiple conspiracy jury instruction impacted their substantial rights, beyond stating that the jury would not have been able to compartmentalize this extraneous information. "Where the evidence demonstrates only multiple conspiracies, . . . [t]he primary risk is 'the transference of guilt from defendants involved in one conspiracy to defendants in another conspiracy.'" *Caver*, 470 F.3d at 237; s*ee also United States v. Blackwell*, 459 F.3d 739, 762 (6th Cir. 2006) ("A defendant's substantial rights are affected if the defendant is convicted on evidence 'unrelated to his own alleged activity.'"). In this case, the district court specifically instructed the jury that "[its] decision on one defendant, whether it is guilty or not guilty, should not influence [its] decision on the other defendant." (R. 488: Jury Instructions, PgID #2387); *id*. ("It is your duty to separately consider the evidence against each defendant."). Because we presume the jury followed these instructions, *see, e.g., Roberts v. Carter*, 337 F.3d 609, 615 (6th Cir. 2003), we must conclude that the jury did not improperly "transfer guilt" from the other co-defendants to Washington. Accordingly, Defendants' variance and multiple conspiracy claims must fail.

11

**1. Severance**

Defendants next argue that the district court erred when it repeatedly declined to sever their trials.  We review a denial of a motion to sever for abuse of discretion.  *United States v. Cody*, 498 F.3d 582, 586 (6th Cir. 2007).

Federal Rule of Criminal Procedure 8(b) provides for joinder of defendants in a criminal case:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

The exception to this rule is stated in Federal Rule of Criminal Procedure 14(a), which provides that "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may . . . sever the defendants' trials."

Defendants made multiple motions to sever before the district court, alleging several concerns, including the fact that the jury would not have been able to properly compartmentalize the evidentiary "spillover" between defendants.  Defendant Washington also asserted that he was being uniquely disadvantaged by being put on trial alongside *pro se* co-Defendant Campbell.  The district court denied each of their motions.

As a general rule, a spillover of evidence does not require severance, *United States v. Lopez*, 309 F.3d, at 971, and may be cured by limiting instructions.  *Zafiro v. United States*, 506 U.S. 534, 539 (1993) ("[L]ess drastic measures, such as limiting instructions, often will

suffice to cure any risk of prejudice."). Reversal is warranted only if the defendants demonstrate "compelling, specific, and actual prejudice from [the] court's refusal to grant the motion to sever." *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005).

Although defendants admittedly may have suffered some slight disadvantage based upon the district court's refusal to sever their trials, it is not enough to demonstrate "compelling, specific, and actual prejudice." *Id*. The district court specifically instructed the jury that "[its] decision on one defendant, whether it is guilty or not guilty, should not influence [its] decision on the other defendant." (R. 488, PgID #2387); *see also id*. (PgID #2392) (directing jury to "consider each defendant separately" when deliberating on conspiracy charge). We find no evidence in the record that the jury was not able to heed the district court's instruction to separately consider the evidence against each defendant.

Defendant Washington also contends that he was further prejudiced because Campbell repeatedly referred to him in front of the jury as "Bear," allegedly in violation of the district court's order *in limine* prohibiting such references. This argument misstates the record, however, as the court's motion only stated that the *court* itself would not refer to Washington as Bear; it said nothing about Campbell. (R. 615, PgID #3630) (After Washington's counsel expressed concern that "there could be some prejudice if you, coming from the Court, have already prejudged that he is Bear," the *court* stated, "I won't be doing that.") (emphasis added). Moreover, Washington did not object midtrial after Campbell referred to him as "Bear," nor did

he renew his motion for severance on that basis. Thus we find that the district court did not abuse its discretion in denying Defendants' motions to sever.

## 2. Evidentiary Rulings

Defendant Campbell argues that his right to a fair trial was jeopardized when the district court refused to issue pretrial subpoenas and requests for discovery that he claims would have aided him in his *pro se* defense. We review a district court's denial of a defendant's request for subpoenas under the abuse of discretion standard and will only reverse if "exceptional circumstances of the case indicate that the defendant's right to a complete, fair and adequate trial [wa]s jeopardized." *United States v. Ross*, 703 F.3d 856, 877 (6th Cir. 2012). We apply the same standard to the appeal of a discovery order. *United States v. Gray*, 521 F.3d 514, 529 (6th Cir. 2008).

Campbell argues that exceptional circumstances existed, including his incarceration, his lack of legal knowledge, and his counsel's failure to obtain the requested records, which precluded him from obtaining information about cell phone records, doctors, pain clinics and individuals that would have aided him in cross-examination at trial. At the hearing to consider the motions, the Government responded that the requested information that was not going to be a part of the Government's case and that the pain clinic records would not be relevant. (R. 614, PgID # 3548-49). The Court accordingly denied the motion, stating that "I don't hear any basis for a good faith belief as to what a pain clinic record does or does not say." (*id*., PgID # 3552). Notably, the district court's denial was *without* prejudice, thus affording Campbell the

opportunity to resubmit his request and explain its relevance. Campbell, however, did not file a subsequent request.

As for his additional discovery requests, which were likewise denied, Campbell does not attempt to identify how he was prejudiced by the district court's determinations. Moreover, Campbell's standby counsel affirmed that the government had provided Campbell with all appropriate discovery, and that the government had provided the materials identified in Campbell's pro se motion. We find no abuse of discretion.

## 3. Campbell's Motion for a Mistrial

Campbell asserts that the district court abused its discretion when it failed to grant a mistrial after the government played a recording in the presence of the jury which referred to Campbell's previous unrelated arrests, in violation of the court's pre-trial orders. We review a district court's denial of a motion for a mistrial for abuse of discretion. *United States v. Carroll,* 26 F.3d 1380, 1383 (6th Cir. 1994).

Prior to the start of trial, counsel for Defendant Campbell made a motion to completely exclude evidence of two previous arrest incidents. The court granted the motion in an Order memorialized on May 14, 2012. (R. 326, PgID # 1148). At trial, during the government's case-in-chief, the prosecution violated this order when it played a recorded conversation between Deputy Craycraft and James Martin:

> Cooperating Witness J. Martin, Jr.: Somebody had just called.
> Craycraft: Okay. Guy that's in the phone call, now, it was
> Bear? Is that who –
> CW J. Martin, Jr.: That was Bear, yes.

> Craycraft: -- you were – you recognize to be Bear?
> CW J. Martin, Jr.: Yes.
> Craycraft: And that's the number that you've always called him at?
> CW Martin, Jr.: Yes.
> Craycraft: And what exactly did he say?
> CW Martin, Jr.: He said to – *that Freddie is going through a rough time right now, where he'd been in jail and out twice in the last month.*
> Craycraft: Uh-huh.
> CW Martin, Jr.: And he needed, you know, Freddie needed some cash.

(R. 616, PgID # 3952-53) (emphasis added).

During a recess, standby counsel notified the district court that the reference to Campbell's previous requests in the recording violated a pretrial order, which excluded evidence relating to Campbell's prior arrests. (R. 326, Order, PgID# 1149). The prosecutor admitted responsibility for its mistake, stating, "So we accept obviously the guilt or the responsibility for the mistake, and we will accept whatever the Court orders." (R. 616, PgID # 3965). Campbell then requested a mistrial but, short of that, did not want the judge to issue a cautionary instruction out of fear that it would "underscore . . . this point" for the jury. (*id.*, PgID #3963). The court denied the motion, stating:

> In the large picture of the trial, sometimes things that seem very critical at the moment kind of disappear. And I think that the jury is hearing evidence from Mr. Martin that it's going to either believe or disbelieve. And in – with regard to his testimony, I think this small reference, although it is important, I think it loses, diminishes in importance compared to whether the jury believes what he's saying. . . . Because you have asked for no cautionary instruction, I am not going to give one.

(*Id.*, PgID # 3968-69).

The district court did not abuse its discretion in arriving at this conclusion. First, there was no evidence that "the government intentionally elicited the reference to [Campbell's] prior

16

arrest." *United States v. Harris*, 165 F.3d 1062, 1066 (6th Cir. 1999). Second, the reference was "isolated," constituting "only a minuscule part of the evidence against" Campbell. *Id.* It was quickly overshadowed by other evidence in the case and the overriding question of Martin's credibility. Finally, the district court thought that a curative instruction would alleviate any prejudice, but declined to issue one due to Campbell's dissuasion. Thus, Campbell is not in a position to allege prejudice from the errant remark, having declined the court's specific offer to issue a curative instruction. We conclude that the district court did not abuse its discretion.

### 4. Sentencing Issues

Campbell alleges that the district court erroneously calculated his sentence by committing two errors: First, he alleges that the court improperly sentenced him using a 400-pill count, rather than a 300 pill count for the purposes of determining his sentencing range; and second, it miscalculated his criminal history score by treating two previous felony convictions in Florida separately, rather than as once incident. We review a district court's sentence for abuse of discretion, and for both procedural and substantive reasonableness. *United States v. Carter*, 510 F.3d 593, 600 (6th Cir. 2007). In doing so, we must ensure that the district court properly calculated the Guidelines range and that it did not select a sentence based on erroneous facts. *United States v. Bolds,* 511 F.3d 568, 578-79 (6th Cir. 2007). The sentencing court's legal conclusions are reviewed *de novo,* and its findings of fact are generally reviewed for clear error. *United States v. Moon,* 513 F.3d 539-40 (6th Cir. 2008). Because there is some ambiguity in the

record regarding the dates of Campbell's prior convictions, we remand the case for a hearing as to whether Campbell's criminal history score was properly calculated.

### A) Sentencing Guideline Range Calculation

Campbell asserts that the district court erred when it used a 400-pill count, rather than a 300 pill-count, in calculating his sentencing range. The court's decision to use a 400-pill count set Campbell's base level at 24, which called for a minimum sentence of 100-125 months, instead of 22, which called for 84-105 months, without consideration of the proper Criminal History Category. We normally review for clear error "factual findings that the district court makes during its application of the Sentencing Guidelines, including the district court's determination of the quantity of drugs attributable to the defendant for sentencing purposes." *United States v. Valentine*, 694 F.3d 665, 672 (6th Cir. 2012). However, "when a party has himself provoked the court to commit an error, that party may not complain of the error on appeal unless that error would result in manifest injustice." *United States v. Demmler*, 655 F.3d 451, 458 (6th Cir. 2011).

In this case, the Probation office originally concluded that Campbell's offenses involved between 700 and 800 oxycodone pills. Campbell objected to this calculation, arguing instead that "It is our position that the proper number of pills should be 300 to 400 pills." (R. 589, PgID #2781). Campbell then repeated this position at the sentencing hearing: "[O]ur argument would be that the 300 to 400 pills would be the correct number of pills attributable to Mr. Campbell."

(R. 609, PgId #3303). Although Campbell preferred "to use the 300" number,[3] he nevertheless acknowledged the 400 amount as well. (*See id*. PgID#3311; #3303) ("[O]ne of the sources had directed 400 of those pills to my client.").

That the court adopted a number within the range proposed by Campbell himself cannot be clear error, even if he preferred the lower number. Defendant Campbell's challenge therefore fails.

### B) Campbell's Criminal History Score

At issue here are two prior convictions from Florida dating back to 1994-95. The Presentence Investigation Report concluded that Campbell had a Criminal History Category VI, based on a criminal history score of 15. (R. 589: Presentence Investigation Report, PgID #2758). In the middle of the sentencing hearing, Campbell objected to the presentence report's treatment of the two Florida convictions as separate events, arguing that the sentences were imposed on the same date, February 17, 1995, and should thus have been treated as one incident for the purposes of calculating his sentencing score. (*Id*., PgID #2781).

The Guidelines state that "[p]rior offenses always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (*i.e.*, the defendant is arrested for the first offense prior to committing the second offense)." U.S.S.G. § 4A1.2(a)(2). "If there is no intervening arrest, prior sentences are counted separately unless (A) the sentences

---

[3] *See* R. 609, PgID #3303 ("According to my calculations, 300 30 milligram Oxycodone pills has a marijuana equivalency of 60 kilograms, which is a base offense level of 22. It is our position that this is the correct drug quantity, because that was the amount that Mr. Campbell allegedly believed was to be delivered to him on June 8, 2011.").

resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day." *Id*.

The government concedes that there were no intervening arrests between the two incidents. However, there is a discrepancy in the record as to whether the sentences were imposed on the same day. Campbell cites sworn testimony of Officer Rafael Guerra in the Violation Report Form in support of his proposition that the two sentences were imposed on the same day. However, the government relies on the Florida Court clerk's cryptic minute entries for its position that the two offenses were imposed on different dates. Because the record remains ambiguous and the district court did not make a finding on the issue, we REMAND the case to the district court for a hearing to determine whether Campbell's criminal history score was properly calculated.

### III.

For the foregoing reasons, we AFFIRM Defendants' convictions, and REMAND for a hearing as to whether Campbell's criminal history score was properly calculated.