**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 17a0100n.06

Case No. 15-5874

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | Feb 08, 2017 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED |
|  | ) | STATES DISTRICT COURT FOR |
|  | ) | THE EASTERN DISTRICT OF |
| JOSE ALBERTO LARA, | ) | KENTUCKY |
|  | ) |  |
| Defendant-Appellee. | ) |  |

BEFORE: ROGERS, SUTTON, and COOK, Circuit Judges.

COOK, Circuit Judge. A jury convicted Jose Lara of various crimes arising from a drug-trafficking operation that straddled the Kentucky-Ohio border. Lara appeals his conviction and sentence. We AFFIRM in part and HOLD IN ABEYANCE in part.

**I. Background**

The drug-trafficking venture began in mid-2012 from a warehouse in Florence, Kentucky, where 100 to 200 pounds of marijuana arrived weekly. Sometimes, Alberto Lara-Chavez, the leader of the drug operation (and Lara's father), drove to Oklahoma to haul the marijuana to the warehouse. Other times, Lara-Chavez's contacts in Texas mailed marijuana-filled boxes to local Kentucky addresses where his associates would retrieve them. On several occasions, Lara arranged for drivers to transport marijuana from California.

Every time a shipment arrived, Lara-Chavez's coconspirators divided, repackaged, and then sold the marijuana. Both Lara and Lara-Chavez participated in varying ways. Lara processed drugs, accompanied coconspirators on sales and deliveries, and recruited individuals to transport marijuana. Lara-Chavez recruited coconspirators, arranged major deals, and organized others to perform essential tasks such as guarding the drugs at the warehouse.

In February 2013, Lara-Chavez expanded into the heroin business, turning a house in nearby Warsaw, Kentucky into the base for the expansion. The Warsaw house's workflow mimicked that of the Florence warehouse, with heroin from Mexico arriving in bulk a few times per month, and Lara-Chavez's heroin team—which included individuals from his marijuana team—repackaging the heroin into tiny balloons for its customers. Several of the heroin team members lived at the Warsaw house to protect the drugs, while others occupied a nearby apartment—an annex where they also stored and sold drugs.

In contrast to Lara-Chavez's hands-on management of the heroin trafficking, Lara's limited involvement consisted of being present at one heroin deal and allowing a coconspirator to transport heroin in a car registered to his name. Regardless, Lara continued to help import and distribute marijuana even after he learned that the conspiracy had expanded into the heroin trade.

In the third extension of his trafficking enterprise, Lara-Chavez rented a house in Sardinia, Ohio, a rural town north of the Kentucky border. In addition to using the property for the storage and sale of drugs, Lara-Chavez's coconspirators cultivated a marijuana field. Throughout this time, Lara-Chavez and his coconspirators continued processing and selling heroin.

Within a year of renting the Sardinia house, federal agents conducted a sting operation that nabbed sixteen conspiracy members. Three defendants chose not to plead guilty, including Lara.

Following an eight-day trial, the jury convicted Lara of conspiring to distribute marijuana (21 U.S.C. § 846). The district court sentenced Lara to 60 months of imprisonment. It also held him jointly-and-severally liable, along with his co-defendants, for all proceeds derived from the drug-trafficking. Lara timely appealed his conviction and sentence.

## II. Prejudicial Variance

Lara argues that the government created a prejudicial variance when it charged a single drug conspiracy in the indictment, but presented evidence at trial that sufficed to prove two separate conspiracies: one for marijuana and one for heroin. We disagree and affirm because the government provided enough evidence for a rational jury to find an overarching drug-trafficking conspiracy.

We review a variance claim raised at trial de novo. *United States v. Caver*, 470 F.3d 220, 235 (6th Cir. 2006) (citing *United States v. Solorio*, 337 F.3d 580, 589 (6th Cir. 2003)).

To succeed on his claim, Lara must show that a variance occurred and that the variance prejudiced his case. *Caver*, 470 F.3d at 235–37. In the conspiracy context, a variance occurs when "an indictment alleges one conspiracy, but the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies." *United States v. Warner*, 690 F.2d 545, 548 (6th Cir. 1982) (emphasis added). We test for a variance by construing the evidence "in the light most favorable to the government" and then assessing whether a rational trier of fact could find that each defendant "had knowledge of and agreed to participate in a single, overarching conspiracy." *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003). This court considers

three factors to determine whether a single conspiracy exists: (1) "the overlapping of the participants in various dealings," (2) "the nature of the scheme," and (3) "the existence of a common goal." *Id.* Only if we find a variance do we then measure the degree of prejudice—that is, the extent to which a jury improperly imputes the conspiratorial activities of a codefendant to the defendant, or otherwise becomes confused about which defendant participated in which conspiracy, *United States v. Gallo*, 763 F.2d 1504, 1526 (6th Cir. 1985)—by evaluating whether "the error of trying multiple conspiracies under a single indictment substantially influenced the outcome of the trial." *Caver*, 470 F.3d at 237 (citing *Kotteakos v. United States*, 328 U.S. 750, 765 (1956)).

On all three variance factors, the government provided ample evidence to support a rational juror's finding of a single, overarching conspiracy. For the overlapping-personnel factor, trial testimony showed at least five core personnel playing a substantial role in the processing, sale, or transportation of both marijuana and heroin. In one example, a conspirator who repackaged and peddled heroin from the drug house in Warsaw, Kentucky later tended the marijuana field in Sardinia, Ohio. Another coconspirator who traveled to California to pick up marijuana seeds also sold heroin. Several of the overlapping coconspirators also socialized and lived in dwellings that stored both drugs. *See Smith*, 320 F.3d at 653 (citing evidence that coconspirators spent recreational time together as proof of a single overarching conspiracy).

As to the nature of the scheme, the record suggests that the coconspirators blended the marijuana operation with the heroin operation. The all-cash rent payments for the Warsaw house (where the bulk of the heroin processing took place) likely came from the proceeds of marijuana sales. The coconspirators stashed both drugs at multiple residences and, in one instance, attempted to settle marijuana debts by exchanging heroin. The same personnel who sold or

processed marijuana oftentimes sold or processed heroin. Several customers purchased both drugs from Lara-Chavez's sellers.

Finally, the conspiracy's collective actions reveal a common goal of profiting from the underground drug market in northern Kentucky. That the group began offering heroin to accommodate their customers' changing tastes does not undermine the existence of a single conspiracy. *See United States v. Olea-Coronado*, 391 F. App'x 508, 509–10 (6th Cir. 2010); *see also United States v. Wilson*, 168 F.3d 916, 924 (6th Cir. 1999).

Lara characterizes his roles in the heroin conspiracy as de minimis. This argument fails, too. "Once the existence of the conspiracy is proven, only slight evidence is necessary to connect a defendant with the conspiracy." *United States v. Hitow*, 889 F.2d 1573, 1577 (6th Cir. 1989). Moreover, a defendant need not participate in all parts or know all other conspirators to be members of the conspiracy. *United States v. Castaneda*, 315 F. App'x 564, 567 (6th Cir. 2009) (citing *Warner*, 690 F.2d at 549); *United States v. Shermetaro*, 625 F.2d 104, 108–09 (6th Cir. 1980). Here, Lara continued to send marijuana from California and recruit drivers to transport the marijuana to Ohio after he learned about the heroin operation. His knowledge of heroin sales, combined with his sustained involvement in the drug-trafficking scheme despite that knowledge, provided a rational jury with sufficient evidence to infer that he participated in the conspiracy with full knowledge of its scope.

Finally, Lara attempts to minimize his overall role in the conspiracy by downplaying his involvement in the marijuana operation. But Lara processed marijuana at the Warsaw warehouse on multiple occasions, accompanied Lara-Chavez to marijuana transactions, delivered $24,000 in drug money, and helped arrange the movement of marijuana from California. This evidence refutes Lara's argument.

Because we find no variance—and thus no possibility that the guilt of his coconspirators or activities of a separate conspiracy improperly influenced the conviction of Lara—we do not address the question of whether a variance prejudiced the trial outcome.

### III. Money-Forfeiture Challenge

Lara argues that the district court had discretion to hold him accountable solely for the forfeiture proceeds from his personal participation in the drug-trafficking rather than all the ill-gotten gains of his coconspirators. Because our decision turns on precedent for which the Supreme Court has recently granted certiorari, we hold Lara's challenge in abeyance pending resolution of the issue.

"We review the interpretation of federal forfeiture laws *de novo*." *United States v. Hampton*, 732 F.3d 687, 690 (6th Cir. 2013) (citing *United States v. Warshak*, 631 F.3d 266, 331 (6th Cir. 2010)). Under the applicable forfeiture statute, 21 U.S.C. § 853, a defendant convicted of a drug offense "shall forfeit to the United States," among other things, "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation." *Id.* § 853(a). Where the government cannot trace the illegal proceeds to specific assets, *id.*, or identify substitute property purchased with the illegal proceeds, *id.* § 853(p), it may seek a personal money judgment against defendants in the amount the defendants received from their illegal activities. *Hampton*, 732 F.3d at 691–92; *United States v. Abdelsalam*, 311 F. App'x 832, 847 (6th Cir. 2009). The government may obtain a forfeiture order even if the defendant does not possess the assets at the time of sentencing. *Hampton*, 732 F.3d at 692 (citing *United States v. Hall*, 434 F.3d 42, 59 (6th Cir. 2005)).

At Lara's sentencing, the district court ordered a forfeiture judgment against Lara in the form of a $162,211 money judgment. This amount represented the money deposited in Lara-

Chavez's bank accounts over the course of the drug conspiracy less cash discovered during a raid of Lara-Chavez's residence. Although the district court expressed concern about holding Lara jointly-and-severally liable for the entire conspiracy's ill-gotten gains, the district court acknowledged that the statutory language and our precedent afforded it no discretion to reduce Lara's liability.

Lara argues that because § 853 expressly mandates only two forms of forfeiture—direct proceeds or substitute property—the "shall" language of the statute applies only to those two forms of forfeiture and not to case-law-created money-judgment forfeitures. As a result, Lara maintains that the district court had discretion to reduce or not order the money judgment.

Lara's attempt to decouple the "shall" language of § 853 from money judgment forfeiture runs headlong into our precedent. This court held in *United States v. Honeycutt*, 816 F.3d 362 (6th Cir. 2016), that "§ 853 mandates joint and several liability among coconspirators for the proceeds of a drug conspiracy." *Id.* at 379 (citations omitted); *see also Abdelsalam*, 311 F. App'x at 847 (holding that a court's power to assess forfeiture-money judgments for a drug offense derives directly from § 853(p)); *Hampton*, 732 F.3d at 691 (collecting cases that hold similarly).

Our decision in *Honeycutt*, however, may not be the last word. In December of 2016, the Supreme Court granted certiorari on the very question of whether "§ 853(a)(1) mandate[s] join-and-several liability among co-conspirators for forfeiture of the reasonably foreseeable proceeds of a drug conspiracy[.]" *United States v. Honeycutt*, 816 F.3d 362 (6th Cir. 2016), *petition for cert. filed*, 2016 WL 4088374 (July 29, 2016) (No. 16-142); *United States v. Honeycutt*, 816 F.3d 362 (6th Cir. 2016), *cert. granted*, 2016 WL 4078900 (Dec. 9, 2016) (No. 16-142). Should the Court reverse our holding in *Honeycutt*, Lara may receive a reduced money-forfeiture judgment.

We therefore hold in abeyance his challenge to the forfeiture order pending issuance of the Supreme Court's decision.

## IV. Conclusion

For these reasons, we uphold the district court's judgment, including Lara's sentence of 60 months' incarceration, but withhold any opinion as to the forfeiture order pending a decision by the Supreme Court in *Honeycutt*. No mandate will issue at this time, and Lara's appeal will be HELD IN ABEYANCE until after the Supreme Court's ruling in *Honeycutt*.