**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0421n.06

**No. 17-1595**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| ANTONIO DEJESUS PEREZ-MARTINEZ | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

FILED
Aug 17, 2018
DEBORAH S. HUNT, Clerk

**BEFORE: MOORE, GIBBONS, and ROGERS, Circuit Judges.**

**JULIA SMITH GIBBONS, Circuit Judge.** After a four-day jury trial, Antonio Perez-Martinez ("Perez") was convicted of multiple charges related to a wire-fraud conspiracy and identity-theft scheme in which he and associates illegally obtained and used consumers' credit-card information. He appeals, alleging a fatal variance from the indictment, improper introduction of evidence, and prejudicial errors in his sentencing. We affirm the district court.

I.

Perez was convicted in January 2017 of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 and 18 U.S.C. § 1343, access device fraud, in violation of 18 U.S.C. § 1029, and aggravated identity theft, in violation of 18 U.S.C. § 1028A, in connection with a credit-card fraud and "skimming" scheme.

At trial, the government demonstrated that Perez spearheaded an operation in which he and associates obtained consumers' credit-account information, encoded that data onto cloned access

devices (i.e., counterfeit credit cards[1]), and then used these cloned access devices to purchase goods and stored-value cards. A primary means by which the group obtained credit-account information was by installing credit-card "skimmers," which have the ability to clone consumers' credit-card information, onto gas station pumps. Once retrieved from a pump, these skimmers would be connected to a computer, and the captured data would be downloaded and encoded onto new cards. The government also introduced evidence that, prior to upgrading to skimmers, Perez purchased compromised credit-card data through an illicit website, which data he then encoded onto cards that he and associates used to make purchases.

Four of Perez's original co-defendants in this case, Raul Gonzalez Falcon ("Falcon"), Yunier Carballo-Pupo ("Pupo"), Manuel Perez-Cabrera ("Cabrera"), and Michael Velazquez-Gregori ("Gregori"), testified against him at trial[2] and outlined the comprehensive fraud scheme headed by Perez. The men all testified that Perez recruited them shortly after they moved to the United States from Cuba to be a part of his credit-card-fraud operation, which he ran out of Austin, Texas. They also outlined the trips that they would take around the country at Perez's instruction to create and use cloned cards.

In June 2015, Pupo, Falcon, Cabrera, Gregori, and three other men, Pedro Sanchez-Pupo, Yoan Mafut, and "Danilo from Miami," traveled from Texas to Ohio to Colorado, attempting to use credit cards encoded with data that Perez had obtained from illicit Internet sites to make fraudulent purchases, though they had a low success rate. On another trip in June or July 2015, Falcon, Cabrera, Gregori, and Mafut traveled to Michigan and again attempted to use cards

---

[1] 18 U.S.C. § 1029 defines "access device" as "any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument)." 18 U.S.C. § 1029(e)(1).

[2] The men testified using translators.

encoded with account information Perez had obtained online, but returned to Texas at Perez's instruction after they had little success. It was around this time that Perez began looking into using credit-card skimmers instead of purchasing compromised accounts online. Perez accompanied Falcon, Pupo, Cabrera, Gregori, Sanchez-Pupo, and Mafut, among others, on another trip, which was to Wisconsin in July 2015 and was the group's first attempt at using a skimmer, which Perez provided. Perez, however, instructed the group to turn back after one day, due to computer problems that prevented them from installing the skimmer. But a subsequent trip was more fruitful. In August 2015, Perez, Falcon, Pupo, Cabrera, Gregori, Mafut, and others travelled to McAllen, Texas, and Perez was able to use the skimmers (which had been previously installed at pumps by Pupo and another conspirator) to code counterfeit cards, which the men were then able to successfully use to make purchases.

Later in August, on a skimming trip to Perry, Michigan, Pupo and Falcon were arrested while installing a skimmer at a gas station. During this arrest, the police seized the skimmer and the laptop that Perez had given them to use. Perez's co-defendants Cabrera and Gregori were arrested in Michigan on September 9, 2015, while on a fraud trip taken at the direction of Sanchez-Pupo.[3] Perez was not arrested until August 8, 2016, when police apprehended him as he was re-entering the United States from Canada in Derby Line, Vermont.

At trial, the prosecution corroborated the witnesses' accounts of the fraud trips with forensic evidence from Perez's seized laptop, from Perez's cell phone, and from his co-defendants' cell phones. Additionally, as proof of Perez's intent to defraud in this case, the government introduced evidence that in 2014 Perez had been prosecuted in Williamson County, Texas, for credit-card fraud. In the 2014 case, Perez pled guilty and was sentenced to deferred adjudication,

---

[3] At trial, the government did not seek to prove that the September 9 trip was done at Perez's direction but instead acknowledged that it represented Sanchez-Pupo's branching out to spearhead a trip of his own.

which required mandatory meetings with a parole officer and placed limits on his travel outside of Williamson County. The prosecution offered Perez's failure to attend mandatory meetings with his probation officer after September 2015 as evidence of his flight in this case.

The jury returned a guilty verdict on all counts, and Perez was sentenced to 144 months' imprisonment. He then filed this appeal.

II.

A.

Perez first claims that there was a fatal variance between the allegations in the indictment and the proof offered at trial, as the indictment alleged only a single conspiracy, and, he argues, the evidence at trial showed multiple conspiracies. There was no fatal variance, because a rational juror could conclude that the evidence at trial showed a single, overarching conspiracy.

1.

This court normally "reviews the question of whether a variance has occurred *de novo*." *See United States v. Caver*, 470 F.3d 220, 235 (6th Cir. 2006). However, if the variance issue was not raised at trial, we review for plain error only. *Id.*; *see also United States v. Soto*, 794 F.3d 635, 658 (6th Cir. 2015). Here, Perez claims that he preserved the variance issue by requesting a multiple-conspiracies jury instruction,[4] while the government argues that the issue was waived. But Perez did not preserve this issue, as his counsel told the district judge that a multiple-

---

[4] Perez conflates his argument that there was a material variance from the indictment with the district court's failure to give a multiple-conspiracies instruction to the jury. A variance and a multiple-conspiracies instruction are generally analyzed as distinct issues. *See United States v. Warner*, 690 F.2d 545, 546–51 (6th Cir. 1982) (addressing variance and a multiple-conspiracies instruction separately). However, here Perez characterizes his argument as dealing with the single issue of whether there was a variance; we have therefore treated it as such.

conspiracies instruction was not warranted and otherwise did not raise the variance issue.[5]  We therefore review for plain error.

Plain error arises only when there is "(1) error, (2) that is plain, and (3) that affects substantial rights."  *United States v. Maliszewski*, 161 F.3d 992, 1003 (6th Cir. 1998) (quoting *United States v. Dedhia*, 134 F.3d 802, 808 (6th Cir. 1998)).  If these factors are present, this court may exercise its discretion to notice a forfeited error if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."  *Id.*

2.

There was no error here, and thus our plain error inquiry concludes at its first step.  *See United States v. Thomas*, 11 F.3d 620, 630 (6th Cir. 1993) ("Absent any error, our inquiry is at an end.").

"A variance to the indictment occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment."  *Caver*, 470 F.3d at 235.  Where, as here, a defendant is charged with a single conspiracy in the indictment, there is reversible error if the evidence at trial could "reasonably be construed *only* as supporting a finding of multiple conspiracies" and the appellant can demonstrate that he was prejudiced.  *United States v. Warner*, 690 F.2d 545, 548 (6th Cir. 1982) (emphasis added).  If, however, considering the evidence "in the light most favorable to the government," a

---

[5] During a jury instructions conference with the district court, Perez's counsel mentioned a multiple-conspiracies instruction only for the purpose of assuring the court that she would not seek such an instruction.  She stated:

> I considered 3.08 and 3.09 regarding evidence of multiple conspiracies. . . . I read quite a lot of case law.  I'm not intending to offer any sort of argument that there were multiple conspiracies and that's a reason why there's a problem with the indictment or something, but *I wanted to raise the issue so that everybody knows I looked at it, I don't think it applies*.

DE 268, Trial Tr. Vol. 3, Page ID 1759 (emphasis added).  Perez's counsel made no further mention of a multiple-conspiracies instruction and later responded "no objection" to the jury instructions as given.  DE 269, Trial Tr. Vol. 4, Page ID 1834.

rational trier of fact could find that each defendant "had knowledge of and agreed to participate in a single, overarching conspiracy," then there is no variance. *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003); *see also United States v. Lara*, 679 F. App'x 392, 394 (6th Cir. 2017).

Determining whether one or multiple conspiracies existed principally depends on three factors: "the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings." *Smith*, 320 F.3d at 652. However, "a single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy." *Warner*, 690 F.2d at 549. Instead, "[t]o prove a single conspiracy, the government need only show that each alleged conspirator had knowledge of and agreed to participate in what he knew to be a collective venture directed toward a common goal." *Smith*, 320 F.3d at 653.

Here, the indictment alleged a single conspiracy to commit wire fraud by using "devices that were designed to secretly record account data from credit cards that gas station customers used," encoding that data onto fraudulent access devices, and then using those devices to make purchases. DE 109, First Sup. Indictment, Page ID 406–07. Perez argues that at trial the government actually presented evidence of several separate conspiracies led by three different men, as well as a separate, earlier conspiracy to obtain credit-card numbers from the "dark web" without using skimmers. Viewing the evidence in the light most favorable to the government, however, a rational juror could conclude that there was a single, overarching conspiracy. *See Smith*, 320 F.3d at 652.

Trial testimony by the four cooperating co-defendants, Falcon, Pupo, Cabrera, and Gregori, outlined a comprehensive credit-card-fraud scheme headed by Perez. The men all testified that

Perez recruited them to his operation shortly after they moved to the United States. Although individual participants across trips might have varied, these trips were all taken at Perez's direction, using equipment and information supplied by him.[6] Thus, their testimony outlining Perez's leadership over and involvement in this operation provided ample evidence of a single, overarching conspiracy.

Additionally, although the indictment focused on the use of credit-card skimmers, applying the three variance factors, a rational juror could conclude that the excursions involving credit-card accounts obtained from the "dark web" were a part of the same conspiracy. *See Smith*, 320 F.3d at 652. The government introduced ample evidence that the goal and nature of the scheme was the same whether the group used the Internet or used skimmers—they sought to obtain credit-card information, copy the information onto access devices, and use those devices to purchase goods charged to consumers' credit-card accounts. *Id.* Additionally, Perez's co-defendants testified that these earlier trips were organized by Perez and undertaken at his instruction. Finally, the participants in the trips that used credit-card information from the Internet overlapped with the participants in the trips that used skimmers. *Smith*, 320 F.3d at 652. For example, Pupo, Falcon, Cabrera, Gregori, and Mafut participated in the June 2015 Ohio trip, and all besides Pupo also went on the Michigan trip in June or July 2015 in which the men attempted to code access devices using credit-card accounts Perez obtained from the Internet. The same co-conspirators—joined by Perez—traveled to Wisconsin in July 2015 and to McAllen, Texas, in August 2015, at which time they had graduated to using skimmers. Thus, although the indictment focused on the use of skimmers, a rational juror could conclude that the trips using credit-card information from the

---

[6] Perez claims that the government improperly offered proof of a trip in September 9, 2015, to Grand Rapids, Michigan, as a part of the alleged overarching conspiracy. The government, however, made clear on multiple occasions at trial that Perez was not involved in this trip and that this trip did not form the basis of the conspiracy charge. This trip is the source of the 27 disputed access devices discussed in Perez's sentencing challenge, *infra*.

"dark web" were a part of the same overarching conspiracy. *Smith*, 320 F.3d at 652; *Lara*, 679 F. App'x at 394–95 (finding no variance where the indictment alleged a marijuana conspiracy but evidence was introduced of a heroin conspiracy with "blended" operations and the same "core personnel" and a "common goal").

Perez also claims that the prosecution improperly introduced evidence of the June 2015 Denver-to-Ohio trip, when the indictment alleged a conspiracy "[b]eginning not later than July 24, 2015." DE 109, First Sup. Indictment, Page ID 406. This "approximate date language," however, is "broad enough to reach events" that occurred in the previous month and does not make for a fatal variance. *United States v. Manning*, 142 F.3d 336, 340 (6th Cir. 1998) (quoting *United States v. Warner*, 82 F.3d 419 (6th Cir. 1996) (unpublished table decision)) (holding that an indictment alleging a drug conspiracy "on or about September 6" was broad enough to encompass related events on August 4 of the same year); *Warner*, 82 F.3d 419 (evidence of conspiracy activities in April 1993 was not a fatal variance when the indictment charged a drug conspiracy "on or about May 1993"); *see also United States v. Ford*, 872 F.2d 1231, 1236 (6th Cir. 1989) ("When 'on or about' language is used in an indictment, proof of the exact date of an offense is not required as long as a date reasonably near that named in the indictment is established.").

Because the evidence at trial could not "reasonably be construed only as supporting a finding of multiple conspiracies," there was no variance from the indictment. *Warner*, 690 F.2d at 548. Thus, we do not address whether Perez suffered any prejudice. *Lara*, 679 F. App'x at 394 ("Only if we find a variance do we then measure the degree of prejudice . . . .").

B.

Perez next alleges that the district court erred in allowing the prosecution to introduce his failure to report to his Texas probation officer as evidence of flight in this case and argues that

instead it should have been excluded under Federal Rule of Evidence 404(b). But the district court did not abuse its discretion in allowing the prosecution to introduce this flight evidence.

1.

This court generally reviews a district court's evidentiary determinations for abuse of discretion. *See United States v. Dixon*, 413 F.3d 540, 544 (6th Cir. 2005). Some panels of this court, however, have contended that there is "an intra-circuit split regarding the correct standard of review for a district court's decision to admit Rule 404(b) evidence." *United States v. Mandoka*, 869 F.3d 448, 456 (6th Cir. 2017) (discussing cases); *see also United States v. Clay*, 677 F.3d 753, 754 (6th Cir. 2012) (Kethledge, J., dissenting from denial of rehearing *en banc*). This is due to a line of Sixth Circuit cases that hold there is a three-part inquiry that the court must undertake when assessing a district court's admission of 404(b) evidence, rather than simply applying the abuse of discretion standard to the entire decision reached by the district court. That is,

> we first review for clear error the district court's factual determination that the "other . . . acts" occurred. Second, we examine *de novo* the district court's legal determination that the evidence was admissible for a legitimate purpose. Finally, we review for abuse of discretion the district court's determination that the probative value of the other acts evidence is not substantially outweighed by its unfairly prejudicial effect.

*United States v. Murphy*, 241 F.3d 447, 450 (6th Cir. 2001) (quoting *United States v. Merriweather*, 78 F.3d 1070, 1074 (6th Cir. 1996)). In any event, the tripartite framework can be viewed as a recognition that we are faced with three distinct questions when reviewing the admission of Rule 404(b) evidence for abuse of discretion. *Mandoka*, 869 F.3d at 457; *see also United States v. Ganier*, 468 F.3d 920, 925 (6th Cir. 2006).

2.

Applying the three-part 404(b) abuse-of-discretion framework, we conclude that the district court did not abuse its discretion in admitting the flight evidence here.[7]

a.

Under the first step of 404(b) review, we assess the district court's determination that the "other acts" occurred for clear error. *See Murphy*, 241 F.3d at 450. Here, there was sufficient evidence to show that he fled from the jurisdiction. Perez's parole officer testified that Perez was compliant with his supervision reporting requirements from February 2015 until September 21, 2015, but beginning with his appointment scheduled for October 23, 2015, he stopped reporting, did not answer calls, and could not be located. Perez was not found until August 2016, when he was arrested re-entering the United States from Canada at Derby Line, Vermont. The district court therefore did not clearly err in concluding there was sufficient evidence that Perez had been on probation and that Perez fled Williamson County.

b.

Under the next step in the 404(b) analysis, we consider *de novo* whether the past conduct evidence "was admissible for a legitimate purpose." *Murphy*, 241 F.3d at 450.

Under Rule 404(b), although "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," it may be admissible "for another purpose." Fed. R. Evid. 404(b). Here, the evidence that Perez was on probation for an earlier Texas conviction and that he failed to appear at parole appointments is undoubtedly evidence of a prior crime or wrong; however, the

---

[7] While considering 404(b) as a possible basis for excluding the flight evidence is appropriate in this case, where the alleged flight occurred at a different point in time from the charged offenses, flight evidence is often analyzed as a part of the offense conduct. *See* 6th Cir. Crim. PJI 7.14 (treating flight as offense conduct); *cf. Farrell v. United States*, 162 F. App'x 419, 422 (6th Cir. 2006) (analyzing flight evidence under 404(b)).

government contends that it was admissible as flight evidence. "Flight evidence comes in as an admission of guilt by conduct," and when it "has genuine probative value . . . 'juries are given the power to determine how much weight should be given to such evidence,'" meaning such evidence can be admissible for a legitimate purpose. *United States v. Dillon*, 870 F.2d 1125, 1126 (6th Cir. 1989) (quoting *United States v. Touchstone*, 726 F.2d 1116, 1119 (6th Cir. 1984)). Courts have, however, "consistently doubted the probative value [of flight evidence] in criminal trials." *Id.* (quoting *Wong Sun v. United States*, 371 U.S. 471, 483 n.10 (1963)). Therefore, to determine whether the past conduct evidence was admissible for a legitimate purpose, we must ensure that it has probative value as flight evidence, which involves a four-step analysis. *See United States v. Oliver*, 397 F.3d 369, 376 (6th Cir. 2005).

This four-step analysis of the probative value of flight evidence considers the strength of four cascading inferences that can be drawn from: (1) "defendant's behavior to flight"; (2) the connection between that flight and consciousness of guilt; (3) whether this consciousness of guilt concerns the crime charged; and (4) whether the defendant's consciousness of guilt is probative of whether he actually committed the crime charged. *See id*; *United States v. Atchley*, 474 F.3d 840, 853 (6th Cir. 2007). Here, all four inferences are "'reasonabl[y] support[ed]' by the evidence." *Oliver*, 397 F.3d at 376 (alterations in original) (quoting *Dillon*, 870 F.2d at 1127).

First, although Perez argues that the prosecution only offered "speculation" as its evidence that he fled the jurisdiction, as discussed, Perez's parole officer testified that Perez stopped complying with his supervision reporting requirements after September 2015 and could not be located until he was later apprehended outside of Texas in August 2016. *See United States v. White*, 543 F. App'x 563, 567 (6th Cir. 2013) (failure to appear for hearing on bond revocation supported finding of flight).

11

The evidence also supports the inference that Perez's flight reflected consciousness of guilt, as his flight coincided with his discovery that the Michigan state case against Falcon and Pupo for installing skimmers was being taken over by federal authorities. At Perez's trial, the attorney who represented Falcon and Pupo in the Michigan case testified that he informed the individual who had hired him to represent Falcon and Pupo—who evidence indicated was Perez[8]—in either late August or early September that "there was a strong likelihood that it would become a federal case." DE 268, Trial Tr. Vol. 3, at 1655–56. We have held that "flight may be proven where it occurs after any event which would tend to spark a sharp impulse of fear of prosecution or conviction in a guilty mind." *Dillon*, 870 F.2d at 1128. And learning that his conspirators' state case was morphing into a larger federal investigation would certainly spark such an impulse. *See id.* ("[A] guilty defendant is almost as unequivocally put on notice of his peril by a convicted co-conspirator who is on the verge of testifying . . . about their common crime.").

Further, the evidence reasonably supports the conclusion that Perez's consciousness of guilt was related to the crimes in this case, as Perez points to no evidence that he was facing other charges or that he had any other motivation to flee Williamson County unrelated to escaping the federal investigation. Finally, the testimony by Perez's four co-defendants at trial that Perez spearheaded the skimming scheme, as well as forensic evidence from his cell phone and laptop, is sufficient to support the fourth flight inference here, connecting Perez's consciousness of guilt to his actual guilt in this case. *See Oliver*, 397 F.3d at 376.

Therefore, because the evidence of Perez's parolee status, communicated by showing that he failed to appear at parole appointments, had probative value as flight evidence, it "was

---

[8] The attorney testified that the man who hired him referred to himself as "Mafut." Perez told Falcon in a recorded jail call that, in calls to the attorney, "mister Mafut, it's me, you hear me?" DE 277, Appellant Ex. 17, Page ID 1990–91. Phone records confirm that the call to the attorney came from a number that all four testifying codefendants testified was Perez's.

admissible for a legitimate purpose" and satisfies the second prong of the 404(b) inquiry. *Murphy*, 241 F.3d at 450.

c.

Under the third and final step of our 404(b) admissibility determination review, the district court did not abuse its discretion in concluding that the probative value of the prior-act evidence was not substantially outweighed by the risk of unfair prejudice. *Id.*; *see* Fed. R. Evid. 403. As outlined, the flight evidence here was probative of Perez's consciousness of guilt of the fraud crimes with which he was charged. Flight evidence, however, is considered to have relatively weak probative value, and here it arguably risked unfairly prejudicing Perez, as it necessitated informing the jury that Perez was on probation—risking that the jury would punish him for his prior bad acts instead of for the conduct for which he was on trial. *See, e.g.*, *United States v. Johnson*, 27 F.3d 1186, 1193 (6th Cir. 1994). The risk of unfair prejudice attendant to this flight evidence, however, was mitigated by the fact that evidence of Perez's prior arrest for credit-card fraud—the offense for which he was on probation—had already been introduced to the jury as proof of Perez's "intent." Perez does not challenge the admission of his prior arrest and conviction for this intent purpose in his appeal. Therefore, the risk of unfair prejudice attendant to the flight evidence is low in light of the fact that his Texas offense was already presented to the jury for another permissible purpose. Moreover, the district court limited the extent to which the government presented evidence of Perez's probation violation to only that necessary to demonstrate his flight.

Indeed, Perez's primary contention in this appeal is not that he was prejudiced by the revelation to the jury that he was on, and then violated, probation, but that the flight evidence was unduly confusing. The district court, however, instructed the jury on proper consideration of the

flight evidence and also instructed them to consider the evidence of Perez's Texas offense for the "intent" purpose only. The district court therefore did not abuse its discretion in concluding that the flight evidence's probative value was not substantially outweighed by the risk of unfair prejudice here.

In conclusion, applying the three-part 404(b) inquiry, the district court did not abuse its discretion in admitting the flight evidence.

C.

Perez next raises two challenges to his sentence. He first claims that the district court erred in its loss calculation because it incorrectly attributed to him 27 credit-card numbers from a September 2015 skimming trip in which he was not involved. He also contends that the district court improperly applied an obstruction of justice enhancement to his sentence. Neither argument has merit.

1.

Perez first challenges the district court's loss calculation as it relates to his sentence for conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. This court reviews a district court's factual findings in sentencing decisions for clear error and its application of a Sentencing Guidelines provision *de novo*. *E.g.*, *United States v. Hazelwood*, 398 F.3d 792, 795 (6th Cir. 2005). Here, any error by the district court would be harmless, as it would not change Perez's base offense level calculation.

The applicable guideline for Perez's 18 U.S.C. § 1349 violation is USSG § 2X1.1, which instructs that the base offense level for conspiracy is determined using the guideline for the substantive offense—here, wire fraud, in violation of 18 U.S.C. § 1343. This directs us to USSG § 2B1.1, which provides a base offense level of seven for fraud and then calculates any offense

level increases by looking to the loss attributable to the defendant. *See* USSG § 2B1.1(a)(1), (b)(1). Here, because there was no known actual loss, the district court used the intended-loss calculation of $500 per access device provided for in § 2B1.1 Application Note 3. USSG § 2B1.1 cmt.3(F)(i) ("In a case involving any counterfeit access device or unauthorized access device, loss . . . shall be not less than $500 per access device."); *see also United States v. Moon*, 808 F.3d 1085, 1092 (6th Cir. 2015). Because the district court determined that there were 687 access devices attributable to Perez—including the 27 fraudulent credit cards confiscated from Perez's co-defendants during their September 9, 2015, arrest—the district court calculated the total loss at $343,500. This resulted in a 12-level base offense level increase, as Perez's loss calculation was more than $250,000 but less than $550,000. *See* USSG § 2B1.1(b)(1)(G)–(H).

Perez argues that the 27 devices from the September 9 trip should not have been attributed to him because there was no evidence that this trip was a part of his jointly undertaken criminal activity. *See* USSG § 1B1.3 (Relevant Conduct (Factors that Determine the Guideline Range)). He objected to these devices' inclusion at sentencing, arguing that "the evidence at trial revealed this trip was orchestrated and directed by Mr. Sanchez-Pupo, and not the defendant." CA6 R. 8, PSR Obj., at 38–39. The government took "no position on Defendant's objection regarding the 27 Sept[ember] 2015 access devices because their inclusion or exclusion would have no effect on the PSR's recommended Guideline calculation" and acknowledged that it had "made a tactical decision at trial not to try and persuade the jury that the September trip was done at Defendant's direction." DE 257, Gov't Resp., Page ID 1328–29 (n.1). The district court ultimately concluded that these devices fell within Perez's relevant conduct.

As Perez acknowledges, even if the district court had not attributed the 27 devices to him, it would not change his base offense level calculation. Without these 27 devices, the loss

calculation would still lead to a base offense level increase of 12 under USSG § 2B1.1(b)(1)(G), as the total loss based on 660 access devices would be $330,000. The district court acknowledged this during sentencing and observed that, even though it overruled Perez's objection, "it doesn't have a guideline impact." DE 272, Sent. Hr'g Tr., Page ID 1941. Accordingly, even if the district court did err in attributing the devices to Perez as part of his relevant conduct, any error would be harmless, and resentencing on this ground would not be necessary.[9] *See United States v. Lanesky*, 494 F.3d 558, 561 (6th Cir. 2007) (remand not required if the government can demonstrate "*with certainty* that the error at sentencing did not cause the defendant to receive a more severe sentence" (quoting *United States v. Johnson*, 467 F.3d 559, 564 (6th Cir. 2006))); *see also United States v. Mizori*, 601 F. App'x 425, 431–32 (6th Cir. 2015) (harmless error when miscalculation of guidelines range resulted in same statutory maximum sentence and the district court indicated it would have given the same sentence "even if [it] had sustained the objections").

2.

Perez next argues that the district court incorrectly applied the obstruction of justice enhancement, USSG § 3C1.1, to his sentence. At sentencing, the government must prove obstruction by a preponderance of the evidence, *United States v. Dunham*, 295 F.3d 605, 609 (6th Cir. 2002), and this court reviews the district court's factual findings for clear error and its conclusion that the facts constitute obstruction of justice *de novo*. *See United States v. Henry*, 819 F.3d 856, 872 (6th Cir. 2016); *United States v. Huntley*, 530 F. App'x 454, 457 (6th Cir. 2013). We hold that the district court correctly applied the obstruction enhancement here.

---

[9] Perez concludes his argument by stating he should be resentenced because "[m]any of the credit card numbers that were attributed to Perez overall were duplicates or had no name on the account, suggesting they were not authentic." CA6 R. 21, Appellant Br., at 57. Perez provides no factual or legal support for this claim, and, moreover, the Presentence Report expressly accounted for any duplication of numbers in tallying the total number of access devices attributable to Perez.

USSG § 3C1.1 requires a defendant's offense level to be increased by two levels if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." USSG § 3C1.1. Advisory Note 4 then provides a "non-exhaustive list of examples of the type of conduct" qualifying as obstruction, including "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." USSG § 3C1.1 cmt.4(A).

Here, the district court determined that the obstruction enhancement was applicable after finding that Perez communicated a threat to Gregori, who was testifying as a witness in this case, through Jose Gallegos—a defendant in an unrelated case whom Perez encountered while he was in U.S. Marshal Service custody pending trial. Gallegos testified that, after learning Gallegos was housed with witnesses Cabrera and Gregori, Perez told him that "he was very disappointed in these other guys, that they were very ungrateful, and they actually was [sic] going to hear from him after this was settled down." DE 269, Trial Tr. Vol. 4, Page ID 1785. Gallegos also testified that Perez asked him to convey to Gregori that Gregori "was going to be hurt after this being [sic] settled down." *Id.* The government produced a U.S. Marshal Service record confirming that Gallegos and Perez had been transported to court together in the same van.

Perez argues on appeal that the obstruction enhancement should not apply because he did not make a "substantial step" toward obstruction of justice because he "did not ask Gallegos to convey any message to Gregori." CA6 R. 21, Appellant Br., at 59. That claim, however, is directly contradicted by Gallegos's trial testimony that Perez "f[ound] out that [Gallegos] was in a housing unit with two other Cubans, and he actually told [Gallegos] to deliver a message to them" and that Perez further "ask[ed] [him] to convey" that Gregori would get hurt after this "settled down."

DE 269, Trial Tr. Vol. 4, Page ID 1784–85. Perez's contention that he was just "venting" and "not asking for a message to be relayed" is further undermined by the fact that Gallegos actually conveyed the message to Gregori, who testified that he received the message and that he "took it as a threat." *Id.* at 1795–96; CA6 R. 21, Appellant Br., at 59.

Perez further argues that his conduct should not be considered obstruction because he did not make this statement directly to the witness who was expected to testify; however, we have recognized that "[a] defendant has obstructed justice when his 'statements can be reasonably construed as a threat, even if they are not made directly to the threatened person.'" *United States v. Kamper*, 748 F.3d 728, 744 (6th Cir. 2014) (quoting *United States v. Jackson*, 974 F.2d 104, 105 (9th Cir. 1992)).

The district court therefore did not err in concluding that Perez's threats amounted to an intentional attempt to obstruct justice, and it correctly applied the obstruction enhancement.

III.

For the reasons stated, we affirm the district court and uphold Perez's convictions and sentence.

**KAREN NELSON MOORE, Circuit Judge, concurring.**  I agree with the majority's opinion, but write separately with respect to Part II.A to address specifically the government's argument about the appropriate standard of review.

Defense counsel raised the material-variance issue before the district court in a discussion regarding a multiple-conspiracies jury instruction, alternatively indicating that she was concerned about the issue and that she did not think that there was a material-variance problem. R. 268 (Trial Tr. Vol. 3 at 137–38) (Page ID #1759–60).  In its briefing, the government suggested defense counsel's discussion of the issue with the district court entirely precluded appellate review of Perez's material-variance argument.  Appellee Br. at 41.  This is incorrect.  At a minimum, we review for plain error if the defendant raises a material-variance argument for the first time on appeal.  *United States v. Soto*, 794 F.3d 635, 658 (6th Cir. 2015).  And, here, Perez's argument fails under both plain-error review and de novo review—the standard applied if the defendant properly raises the issue of variance before the trial court.  *Id.*